**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **HARVEY REIF,**<br><br>    Plaintiff,<br><br>    v.<br><br>**DEPARTMENT OF LABOR,** *et al.*,<br><br>    Defendants. | No. 23-cv-3689 (TSC) |

**MEMORANDUM OPINION**

Plaintiff Harvey Reif was exposed to various sources of radiation during his work as a contractor employee at nuclear facilities operated by the Department of Energy ("DOE"). J.A. 665–66. Reif was subsequently diagnosed with 36 cancers, which he and his doctors claim were caused by his work at DOE. *See*, *e.g.*, J.A. 638. He now challenges the Department of Labor's ("DOL") decision denying him compensation under the Energy Employees Occupational Illness Compensation Program Act ("CPA"). Because several legal errors infected the agency decision under review, the court will GRANT in part and DENY in part Reif's Motion for Summary Judgment, ECF No. 25; DENY Defendants' Cross Motion for Summary Judgment, ECF No. 27; VACATE the denial of Reif's most recent claims; and REMAND to the agency for reconsideration of Reif's claims in accordance with this Opinion.

**I.    BACKGROUND**

**A.  Legal Background**

Congress enacted the CPA in 2000 to compensate covered individuals who suffer from illnesses related to their exposure to toxic substances during their work at DOE nuclear facilities.

42 U.S.C. § 7384(a)(8). In enacting this legislation, Congress recognized that "recurring exposures to radioactive substances and beryllium [], even in small amounts, can cause medical harm." *Id.* § 7384(a)(1). Under Part B of the Act, covered employees can receive $150,000 and medical benefits for cancers sustained in the performance of their duties at covered facilities. *See Id.* §§ 7384n(b), 7384(a)(1), (b); *see also* 20 C.F.R. § 30.210. Under Part E, certain DOE contractor employees can receive up to $250,000 based on impairment or wage loss due to covered illnesses related to toxic exposure at a DOE facility. *See* 42 U.S.C. §§ 7385s, 7385s–2.

An individual seeking compensation under either Part must file a claim with DOL's Office of Workers' Compensation Programs ("OWCP").[1] *See* 20 C.F.R. §§ 30.100, 30.101. The claimant bears the burden of establishing eligibility for compensation, which includes producing evidence of covered employment and diagnosed illnesses. *See id.* §§ 30.111, 30.112, 30.114. But OWCP is obligated to provide a claimant with "assistance . . . to develop facts pertinent to the claim." 42 U.S.C. § 7384v(a)(2). Notably, OWCP has several tools at its disposal to help a claimant do so, including the power to subpoena documents and witnesses. *Id.* § 7384w.

### a. Part B

There are two pathways for establishing eligibility for Part B benefits related to radiogenic cancer. Under the first, an employee must show that (1) he has been diagnosed with certain cancers, (2) he qualifies as a member of the Special Exposure Cohort, and (3) he contracted the specified cancer after working at certain facilities. 20 C.F.R. § 30.210(a)(1). If the employee is a

---

[1] The Secretary of Labor has "primary responsibility for administering" the Compensation Program, which the Secretary has delegated to the OWCP. Exec. Order 13,179, 65 Fed. Reg. 77,487, 77,488 (Dec. 7, 2000). The Secretary of Health and Human Services, through the National Institute of Occupational Safety and Health, has responsibility for developing guidelines and methods for assessing the probability that an individual with cancer sustained the cancer working at a DOE facility. *See* 65 Fed. Reg. at 77,488; *see also* 42 U.S.C. § 7384p.

member of the Cohort, his exposure to substances at DOE facilities is presumed to be the cause of his cancer; no further factual development is necessary. *See* 42 U.S.C. § 7384l(9)(A).[2]  Under the second pathway, an employee can establish eligibility by showing that (1) he has been diagnosed with cancer, (2) he contracted that cancer after beginning work at certain facilities, (3) the "cancer was at least as likely as not related to the employment" at the facility, and (4) the employee "has been diagnosed with an injury, illness, impairment, or disease that arose as a consequence of the accepted cancer."  20 C.F.R. § 30.210(a)(2); *see also* 42 U.S.C. § 7384n(b).

To determine whether a cancer is "at least as likely as not related to the employment" at a DOE facility, the OWCP transfers its findings regarding the claimant's employment history and diagnoses to the National Institute for Occupational Safety and Health ("Institute") at the Department of Health and Human Services.  20 C.F.R. § 30.115.  The Institute performs a "dose reconstruction"—that is, a "reasonable estimate[] of the radiation doses received by" the claimant.  42 U.S.C. § 7384n(d); *see also* 42 C.F.R. § 82.14.  Once completed, the Institute provides the claimant with a draft dose reconstruction report and gives them an opportunity to provide additional information.  *See* 42 C.F.R. § 82.10(l).  After the claimant signs a form indicating that he has no further information to provide, the Institute forwards the dose reconstruction report to the OWCP.  *See id.* § 82.10(n).

---

[2]  Reif fleetingly argues that the OWCP "should have given [him] the benefit of the doubt . . . that he was eligible for inclusion in the Special Exposure Cohort."  Pl.'s MSJ at 22.  But he neither cites any authority that there is a benefit of the doubt rule in this particular context, nor develops any argument that he qualifies for the Cohort.  *See id.*  He has accordingly forfeited that claim. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) ("A party forfeits an argument by mentioning it only in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (cleaned up)).  The court will instead analyze whether he is eligible under the pathway for non-Cohort employees.

The OWCP then uses the dose reconstruction report, together with the diagnoses and other information provided by the claimant, "to calculate . . . the probability that the cancer of the covered employee was caused by radiation exposure at a covered [DOE] facility." 42 C.F.R. § 82.4. Specifically, the OWCP inputs this information into a software program created by the Institute called the Interactive Radio Epidemiological Program ("IREP"). *See* J.A. 189; *see also* 42 C.F.R. § 81.20(b). The IREP then produces an estimated probability of causation ("PoC"). *See* 42 C.F.R. § 81.20. The OWCP is required by statute and regulation to use the Institute's dose reconstruction and the IREP to calculate PoC. *See* 42 U.S.C. § 7384n (requiring the OWCP to follow the guidelines and use the dose reconstruction established by the Institute); *see also* 42 C.F.R. §§ 81.6, 81.20; 20 C.F.R. § 30.213. A person is deemed "at least as likely as not" to have sustained cancer through their DOE work if his PoC "is 50% or greater." 20 C.F.R. § 30.213(b).

### b. Part E

If a claimant is determined eligible under Part B or the former Part D, that claimant is also deemed, for the purposes of Part E, to have contracted a covered illness through exposure at a DOE facility. *See* 42 U.S.C. § 7385s-4. "In any other case, a Department of Energy contractor employee shall be determined . . . to have contracted a covered illness through exposure at a [DOE] facility if it is at least as likely as not" that work-related exposure to toxic substances at a DOE facility "was a significant factor in aggravating, contributing to, or causing the illness." *Id.* § 7385s-4. A toxic substance is any substance "that has the potential to cause illness or death because of its radioactive, chemical, or biological nature." 20 C.F.R. § 30.5(kk).

### c. The Adjudication Process

Once claims are factually developed and PoC has been calculated, the relevant OWCP district office issues recommended findings of fact and conclusions of law. 20 C.F.R. § 30.300.

The claimant then has 60 days to file written objections with the OWCP's Final Adjudication Branch. *Id.* § 30.310. If requested, the Branch conducts an informal hearing before issuing a final decision. *Id.* §§ 30.314, 30.316. A dissatisfied claimant may request reconsideration of that final decision within 30 days of the decision. *Id.* § 30.319(a).

**B. Factual Background and Procedural History**

This case has a long and tortured history. Reif filed his first claim with the OWCP in 2005, seeking compensation for cancers of the kidneys, bladder, rectum, and skin. *See* J.A. 4139. He has filed additional claims as additional cancers were diagnosed, and the OWCP has issued a series of decisions denying Reif's various claims. *See, e.g.*, J.A. 1874–75. The court assumes the parties' familiarity with this long history and will not recount it in full here. Instead, the court will focus on the decisions that Reif challenges in this lawsuit: (1) the Jacksonville district office's decision recommending denial of Reif's most recent claims, *see* J.A. 314–25, (2) the FAB's July 2023 decision adopting the district office's recommendation and denying Reif's claims, *see* J.A. 185–99, and (3) the FAB's October 2023 final decision denying reconsideration of the July 2023 decision, *see* J.A. 27–33. *See* Compl. ¶¶ 1, 20.

Reif worked for nearly 15 years as a covered DOE contractor employee at three covered facilities. *See* J.A. 187–88; *see also* J.A. 320. First, he had several stints at the Savannah River Site between November 1988 and October 1995, again from August 2002 to February 2004, and again from May 2009 to November 2010. His roles at the Savannah River Site included that of Senior Staff Analyst, Technical Writer, Quality Control Engineer, and Training Specialist. Second, he worked at the Paducah Gaseous Diffusion Plant between March 1996 and June 1998, again from June 2000 to February 2001, and again from January 2002 to August 2002. His roles included that of Senior Training Specialist, Technical Writer, and Senior Technical Writer.

Finally, he worked at the Nevada Test Site from November 2006 to February 2008 as a Senior Workforce Specialist.

The decisions under review adjudicate Reif's most recent Part B claims for four skin cancers and pancreatic cancer, and his most recent Part E claims for 15 skin cancers and pancreatic cancer. *See* J.A. 314, 319. In September 2022, the Jacksonville OWCP district office referred these claims to the Institute for an updated dose reconstruction. *See* J.A. 318. The Institute then performed its eighth dose reconstruction in Reif's case, which included all 36 of Reif's diagnosed cancers, even though Reif only had active claims for 16 of them. *See* J.A. 634, 638.

Upon receiving the eighth dose reconstruction, the Jacksonville district office inputted the dose reconstruction and other information into the Interactive Radio Epidemiological Program to calculate the probability that Reif's cancers were caused by "occupational radiation exposure." J.A. 321. The district office calculated a probability of causation of 39.27%. *Id.* Because the PoC was not 50% or greater and Reif did not qualify for the Special Exposure Cohort, the district office recommended denying Reif's Part B claims. *Id.* at 320–21; *see also* 20 C.F.R. § 30.213(b). The district office also recommended denying Reif's Part E claims. First, it applied "the PoC calculation from Part B . . . to rule out radiation [as] a factor in the development of [Reif's] skin and pancreatic cancer under Part E." J.A. 321. Then, it determined there was no evidence that exposure to chemical or biological toxic substances—*i.e.*, toxic substances other than radiation—was a significant factor behind Reif's cancers. *See* J.A. 321–24. The district office also rejected four medical opinions submitted by Reif, concluding that those opinions did not "provide any specificity regarding the toxic substances [Reif] encountered that were related to [his] cancers." J.A. 322.

Reif timely objected to the district office's recommended decision.  J.A. 191.  Following an informal hearing, the Final Adjudication Branch affirmed the district office.  J.A. 197–98.  The FAB rejected Reif's challenges to the dose reconstruction and PoC calculation.  *See* J.A. 196–97.  And it agreed with the district office that there was insufficient evidence that Reif was exposed to biological and chemical toxic substances like arsenic during his employment.  *See* J.A. 194, 197–98.

Reif timely moved for reconsideration.  *See* J.A. 28.  He also submitted 130 pages of newly obtained evidence showing the presence of highly radioactive plutonium contaminated with high levels of uranium and transuranic materials at the Paducah Gaseous Diffusion Plant.  J.A. 33.  That is significant because Reif testified that when he worked at Paducah, he "closely observe[d] work performed by others in the field" and had significant exposure to radioactive waste "while closely working with waste operators."  J.A. 191.

In its October 2023 reconsideration decision, the FAB acknowledged that the Institute's "dose reconstruction report supports that [Reif was] exposed to radiation during [his] employment at DOE facilities," but concluded the PoC calculation made him ineligible for Part B benefits and that "the PoC calculation from Part B ruled out that radiation alone is a factor in the development of [Reif's] cancers."  J.A. 30.  The FAB reiterated that the "evidence failed to show that [Reif was] exposed to" any chemical or biological toxic substances that caused, aggravated, or contributed to his cancers.  *Id.*  And the FAB rejected his new evidence regarding plutonium because "this evidence [did] not prove that [Reif was] exposed to them while [he] worked" at the Paducah facility.  J.A. 33.

Reif then filed this lawsuit in December 2023.  He asks the court to award him full benefits under both Part B and Part E.  Compl. – Prayer for Relief, pp. 14–15.  In the alternative, he requests

that the court vacate the denial of benefits and remand to the OWCP for further proceedings in accordance with the CPA and applicable regulations.  *Id.*

## II.    LEGAL STANDARDS

"When a plaintiff challenges an agency's administrative decision, the court applies the standard of review set forth under the relevant statute or, if no standard is specified, the court applies the standard of review set forth in the Administrative Procedure Act."  *Stephens v. Dep't of Lab.*, 571 F. Supp. 2d 186, 191 (D.D.C. 2008).  "Because Part B of the Act does not contain a standard of review and does not require that a formal hearing be held," "the arbitrary and capricious standard set forth in section 706(2)(A) of the Administrative Procedure Act" ("APA") applies to the denial of Reif's Part B claims.  *Hayward v. Dep't of Lab.*, 536 F.3d 376, 379 (5th Cir. 2008).  Under that standard, this court "shall hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Unlike Part B of the Act, Part E supplies a standard of review.  Specifically, it provides that a reviewing court "may modify or set aside" a final decision on a Part E claim "only if the court determines that such decision was arbitrary and capricious."  42 U.S.C. § 7385s-6(a).  Because Part E's arbitrary and capricious standard is similar to the APA's standard, courts have looked to APA caselaw in applying Part E's review provision.  *See Stephens*, 571 F. Supp. 2d at 191; *see also Watson v. Solis*, 693 F.3d 620, 623–24 (6th Cir. 2012).

"The question whether agency action is arbitrary and capricious is a legal one generally made on the administrative record and resolved on summary judgment."  *Huashan Zhang v. U.S. Citizenship & Immig. Servs.*, 978 F.3d 1314, 1319 (D.C. Cir. 2020).  Because summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported

Page 8 of 15

by the administrative record and otherwise consistent with the APA standard of review," the typical summary judgment "standard set forth in [Federal Rule of Civil Procedure] 56(c) does not apply." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89–90 (D.D.C. 2006).

Although the court's "review under the arbitrary and capricious standard is deferential," it is nevertheless required to set aside agency action if the agency "'has entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Evergreen Shipping Agency Corp. v. Fed. Maritime Comm'n*, 106 F.4th 1113, 1117 (D.C. Cir. 2024) (quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Although the court "must uphold decisions that are 'reasonable and reasonably explained,'" *NextEra Energy Resources, LLC v. FERC*, 118 F.4th 361, 368 (D.C. Cir. 2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)), a decision "cannot be sustained 'where it is based . . . on an erroneous view of the law.'" *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 646 (D.C. Cir. 1998) (quoting *Prill v. NLRB*, 755 F.2d 941, 947 (D.C. Cir. 1985)); *see also id.* at 646 n.3 ("Some courts explain this via the principle that agency action founded on mistake of law is arbitrary and capricious within the meaning of § 706(2) of the Administrative Procedure Act.").

## III.    DISCUSSION

### A. Part B Claims

Reif first argues that it was arbitrary and capricious for the OWCP to reject without much consideration his newly obtained evidence regarding the presence of highly radioactive materials at the Paducah Gaseous Diffusion Plant. *See* Pl.'s MSJ at 21–23. In Reif's view, the OWCP

should have at least provided him assistance in developing facts regarding his potential exposure to these substances.  *Id.* at 21–22.  The court agrees.

In its October 2023 reconsideration decision, the Final Adjudication Branch rejected Reif's newly obtained evidence because "this new evidence does not prove that [Reif was] exposed to the alleged substances at the Paducah GDP."  J.A. 33.  But the FAB did not indicate that it took any steps to help Reif develop evidence regarding his potential exposure to these highly radioactive materials.  *See id.*  That is problematic because the OWCP is statutorily required to help Reif "develop facts pertinent to [his] claim."  42 U.S.C. § 7384v(a)(2); *see also* 20 C.F.R. § 30.2(a) (noting that OWCP has been delegated responsibility for providing claimants with the assistance needed to develop their claims).

This statutory duty makes a great deal of sense; after all, the information the FAB faulted Reif for not having is information that, if it exists, would likely be in the hands of the government.  *See* 42 U.S.C. §§ 7384(a)(2), 7384(a)(3) (noting that records regarding toxic exposure are in the government's control and had historically been kept secret from workers).  Indeed, at different points in these proceedings, the OWCP had reviewed DOE records to try to ascertain Reif's exposure to radiation at DOE facilities.  *See, e.g.*, J.A. 200 (noting that the FAB had "reviewed . . . the DOE radiation records for Mr. Reif").  And given that Reif's probability of causation is already a significant 39.27% and record evidence indicates that Reif worked in close proximity to radioactive waste at the Paducah facility, *see* J.A. 191, 200, the development of this additional evidence and an updated dose reconstruction could plausibly establish that it is at least as likely as not that Reif's cancers were caused by radiation exposure.  Thus, the FAB should have fulfilled its statutory duty to help Reif develop the evidence it faulted him for not yet having.  At the very least, the FAB should have explained why this potential additional exposure would not sufficiently

move the needle or why it did not or could not assist Reif in developing his claim regarding additional plutonium at the Paducah Plant. The FAB's failure to offer such an explanation was arbitrary and capricious. *See Antilles Consol. Educ. Ass'n v. FLRA*, 977 F.3d 10, 15 (D.C. Cir. 2020) ("An agency decision is arbitrary and capricious if it is not reasonably explained.").

In their summary judgment briefing, Defendants simply repeat the FAB's deficient reasoning. Specifically, they argue that the FAB adequately explained that Reif's newly obtained evidence "does not prove that Reif was exposed to [these additional radioactive materials] while he worked" at the Paducah facility. Defs.' MSJ at 31. This misses the point. As explained above, the OWCP has a statutory duty to help Reif develop evidence and the FAB neither fulfilled this duty nor explained why it was unable to provide Reif assistance. Defendants also contend that "any suggestion" that Reif's new evidence "should have altered the Institute's dose calculation . . . is undermined by the Institute's comprehensive eighth dose reconstruction report." Defs.' Reply at 6, ECF No. 30. That argument makes little sense because the new evidence emerged after the Institute's eighth dose reconstruction, so the Institute's report could not have accounted for it.

### B. Part E Claims

Reif next contends that the decisions under review are arbitrary and capricious because the OWCP applied an incorrect legal standard in denying Reif's claims under Part E. *See* Pl.'s MSJ at 32–33. The court agrees. Although under Part B, a claimant must establish a 50% or greater probability that work-related radiation exposure *caused* the claimant's cancer, *see* 20 C.F.R. § 30.213(b), the CPA establishes a meaningfully less demanding threshold for Part E claims. A Part E claimant need only show that work-related exposure to toxic substances, including radiation, was "at least as likely as not . . . a significant factor in aggravating, contributing to, *or* causing the illness." 42 U.S.C. § 7385s-4 (emphasis added); *see also* 20 C.F.R. § 30.5(kk) (defining toxic

substances to include radiation).  And it is easier, after all, to show that radiation exposure aggravated or contributed to a cancer than to show that exposure caused the cancer outright.

In the decisions under review, the OWCP determined that radiation was not a "significant factor in aggravating, contributing to, or causing the illness" because the probability of causation was not 50% or greater.  To start, the Jacksonville district office concluded that "the PoC calculation from Part B is applied *to rule out* that radiation is a factor in the development of your skin and pancreatic cancer under Part E."  J.A. 321 (emphasis added).  The district office then pivoted to whether exposure to biological or chemical substances, such as arsenic or mercury, was a significant factor, but failed to otherwise consider whether radiation exposure significantly aggravated or contributed to Reif's cancers.  *See* J.A. 321–24; *see also* J.A. 190 (indicating that the district office and Final Adjudication Branch only searched Site Exposure Matrixes "to ascertain if [Reif] encountered any specific biological or chemical substances that had a skin cancer health effect").  The district office rested its determination that radiation exposure was not a significant factor simply on the less than 50% probability that radiation exposure *caused* Reif's cancers.  J.A. 321.

Although a PoC of 39.27% may fall just short of showing that radiation exposure *caused* Reif's cancers, it does not follow that such a significant PoC "*rule[s] out*" radiation as a significant factor in *aggravating* or *contributing* to Reif's cancers.  J.A. 321 (emphasis added).  Unlike Part B's more stringent causation standard, Part E does not require a PoC of 50% or more.  The district office—by treating the below 50% PoC as dispositive with respect to whether radiation is a significant aggravating or contributing factor—erroneously imported Part B's higher causation threshold into Part E.  *See Sea-Land Serv.*, 137 F.3d at 646 (explaining that an agency decision "cannot be sustained 'where it is based . . . on an erroneous view of the law'" (cleaned up)).

Indeed, if there is a two in five chance that radiation exposure outright caused Reif's cancers, it would seem more likely than not that radiation exposure at least aggravated or contributed to those cancers, especially because Reif had no significant exposure to carcinogens outside work and there appears to be no alternative explanation in the record for his extraordinary number of cancers. At the very least, the district office arbitrarily failed to explain why a 39.27% PoC does not establish that radiation exposure significantly aggravated or contributed to Reif's cancers. *See Mistick PBT v. Chao*, 440 F.3d 503, 512 (D.C. Cir. 2006) ("An agency's 'failure to respond meaningfully to the evidence renders its decisions arbitrary and capricious.'" (quoting *Alaska Petro. Co. v. FERC*, 234 F.3d 1286, 1294 (D.C. Cir. 2000)).

The Final Adjudication Branch then affirmed the district office's faulty reasoning with respect to Part E without addressing or fixing it. Nowhere in its analysis of Reif's Part E claims did the FAB explain why a 39.27% probability that radiation exposure outright caused Reif's cancers did not at least indicate that radiation exposure significantly aggravated or contributed to those cancers; instead, the FAB repeated the district office's focus on whether biological or chemical substances were aggravating or contributing factors. *See* J.A. 194–95, 198. The FAB appears to have implicitly and erroneously treated the Institute's dose reconstruction and the resulting 39.27% PoC as dispositive of any Part E claims based on radiation exposure, without separately considering whether radiation was an aggravator or contributor. *See* J.A. 194 ("[R]adiation is a toxic substance under Part E that requires the dose reconstruction analysis by the NIOSH to determine its effects.").

Finally, in the October 2023 final decision denying reconsideration, the FAB repeated and compounded the previous errors. In response to Reif's argument that the agency failed to adequately consider whether radiation aggravated or contributed to Reif's cancers under Part E,

the FAB responded that "the PoC calculation from Part B ruled out that radiation alone is a factor in the development of your skin and pancreatic cancers under Part E."  J.A. 30.  Rather than correcting the district office's erroneous application of Part B's higher causation threshold to Reif's Part E claims, the FAB expressly endorsed it, stating that a "determination under Part E regarding the impact of radiation is based on the outcome of the PoC."  J.A. 32.

The reconsideration decision confirms that at every level of review, the OWCP treated the below 50% PoC as dispositive of Reif's Part E claims based on radiation exposure—without ever conducting the separate analysis Part E requires into whether radiation was a significant factor in aggravating or contributing to Reif's cancers.  Indeed, the OWCP never explained why a 39.27% PoC is not itself persuasive evidence that radiation exposure at least aggravated or contributed to Reif's staggering number of cancers.

In sum, the OWCP's denial of Reif's Part E claims was arbitrary and capricious and must be vacated.  On remand, the OWCP must be careful not to apply Part B's heightened causation threshold to Reif's Part E claims.  It must also consider whether a significant probability of causation—combined with the apparent absence of an alternative explanation for Reif's extraordinary number of cancers—indicates that radiation exposure was at least as likely as not a significant factor in aggravating or contributing to Reif's diseases.

## IV.    CONCLUSION

For the reasons explained above, the court concludes that the OWCP's denial of benefits under both Part B and Part E was arbitrary and capricious because of several legal errors made by the agency.  The court cannot conclude, however, that Reif is clearly entitled to those benefits, in part because that determination hinges on the "evaluation of complex scientific data," a task better

left to "the agency's technical expertise." *Nat'l Ass'n of Surface Finishing v. EPA*, 795 F.3d 1, 7 (D.C. Cir. 2015) (quoting *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997)).

Rather than jumping the gun and awarding Reif benefits outright, the court will vacate the challenged decisions and remand to the OWCP so it can use its relative technical expertise to reexamine Reif's claims consistent with the correct legal framework. *See Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 79 (D.D.C. 2016) (explaining that "the proper remedy" is generally "to remand to the agency the task of making a determination consistent with the court's ruling rather than to award" benefits outright (cleaned up)); *see also Jones v. Colvin*, 952 F. Supp. 2d 126, 133 (D.D.C. 2013) (similar).

Accordingly, the court will GRANT in part and DENY in part Reif's Motion for Summary Judgment, DENY Defendants' Cross Motion for Summary Judgment, VACATE the denial of Reif's most recent claims and REMAND to the OWCP for further proceedings consistent with this Opinion. A separate Order will follow.

Date: March 29, 2026

*Tanya S. Chutkan*
———————————————
TANYA S. CHUTKAN
United States District Judge